1                  IN THE UNITED STATES DISTRICT COURT

2                 FOR THE WESTERN DISTRICT OF MICHIGAN

3                          SOUTHERN DIVISION

4

5    UNITED STATES OF AMERICA,

6               Plaintiff,

7       v.                          CASE NO: 1:03-CR-291
                                             1:07-CR-267

8    TOBY T. STUDABAKER,

9               Defendant.

10   _____/

11
                             * * * *
12                      REDACTED TRANSCRIPT
                        SENTENCING HEARING
13                           * * * *

14   BEFORE:   THE HONORABLE PAUL L. MALONEY
                      United States District Judge
15                    Kalamazoo, Michigan
                      April 21, 2008
16
             APPEARANCES:
17
             APPEARING ON BEHALF OF THE PLAINTIFF:
18
                      DANIEL Y. MEKARU
19                    Assistant United States Attorney
                      P.O. Box 208
20                    Grand Rapids, Michigan  49501-0208

21           APPEARING ON BEHALF OF THE DEFENDANT:

22                    PAUL J. DENENFELD
                      LaGrand & Denenfeld
23                    161 Ottawa Avenue, N.W., Suite 404
                      Grand Rapids, Michigan  49503-2712

24

25


             KATHLEEN S. THOMAS, U.S. District Court Reporter
        410 West Michigan Avenue, Kalamazoo, Michigan  49007
                          (269)385-3050

```
 1                        Kalamazoo, Michigan

 2                        April 21, 2008

 3                        at approximately 3:09 p.m.

 4                        PROCEEDINGS

 5           THE COURT:  This is 03-291 and 07-267; the

 6    United States of America vs. Toby Studabaker.  This matter is

 7    before the Court for sentencing.

 8           The record should reflect that Assistant United

 9    States Attorney Daniel Mekaru is here on behalf of the

10    government.  Attorney Paul Denenfeld is here on behalf of the

11    defendant.  The defendant is present in person.

12           The defendant pled guilty before Magistrate Judge

13    Ellen S. Carmody on November 20 of the year 2007, in both

14    files.  The plea was accepted by Senior Judge Richard Alan

15    Enslen on December 20 of the year 2007.  The case was

16    reassigned to this Court recently, I believe, just prior to the

17    adjourned sentencing date in this matter.  At that time, there

18    was a request for a continuance.  The Court asked for briefing

19    on certain legal issues in the case.  I do have one objection

20    to resolve.  I don't know if it's been withdrawn or not.

21           Mr. Mekaru, do you seek a ruling, sir, on the issue

22    related to Guideline 4B1.5, related to pattern of conduct?

23           MR. MEKARU:  Yes, your Honor.  But we don't have any

24    additional evidence to present to the Court.  We rely on our

25    briefs and the reports that were generated by the, I think it
```

1   was the Michigan State Police out of St. Joseph County.

2          Thank you.

3          THE COURT:  All right.  Thank you.

4          Mr. Denenfeld, do you wish to be heard on that

5   matter, other than what is in your memo?

6          MR. DENENFELD:  I'll rest on what is in my memo, your

7   Honor.

8          THE COURT:  All right.  Thank you.

9          The government over-- or the Court overrules the

10  government's objection.  The Court finds there is inadequate

11  evidentiary support for the application of that guideline,

12  which would have resulted in an, I believe it was a five-level

13  enhancement.  But in any event, the Court finds that that is

14  not a guideline that should be scored.  Accordingly, the

15  government's objection is overruled.

16         The Court finds under the advisory guidelines that

17  the Advisory Guideline Level is 27, the Criminal History

18  Category is I, resulting in a guideline range of 70 to 80

19  months.

20         Mr. Mekaru, setting aside the objection I've just

21  overruled, is the guideline range appropriately scored?

22         MR. MEKARU:  Yes, your Honor.  I just, again, this is

23  more perhaps-- perhaps this is more in the nature of my request

24  for the departure for variance, but I did note that because we

25  folded two cases in together, and I've always considered the

1    exploitation of the child and the sexual assault against a

2    child to be a major case, that we have folded in the prior

3    conviction from England into the scoring of his criminal

4    history-- I'm sorry, into the scoring of his relevant conduct,

5    so therefore, it's not available for the criminal history

6    computation, that it otherwise would be if we were only dealing

7    with the child pornography case out of North Carolina.  Because

8    it all is folded in, I am willing to so state that we don't

9    have any objections.  I just wanted to make note that there is

10   that issue.  So I realize I'm speaking perhaps out of both

11   sides of my face, but we will stand by the computation as is.

12           THE COURT:  All right.  I mean this is for purposes

13   of determining whether the guidelines are adequately-- or

14   completely and accurately scored.  I recognize that there are

15   requests for variances on both sides, and the Court has given

16   notice of a potential upward departure or variance also.  But

17   for purposes of nailing down whether the advisory guideline

18   range is appropriately scored or not, do you concur or not?

19           MR. MEKARU:  I'm sorry, your Honor, yes, I do.

20           THE COURT:  Mr. Denenfeld?

21           MR. DENENFELD:  I believe so.  I thought I heard you

22   say 70 to 80 months, and I think it's 87.

23           THE COURT:  It's 87.

24           MR. DENENFELD:  Yes, your Honor.

25           THE COURT:  Thank you.


                KATHLEEN S. THOMAS, U.S. District Court Reporter
            410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1            All right.  Mr. Mekaru, are you moving third level of

2   acceptance?

3            MR. MEKARU:  Yes, your Honor.

4            THE COURT:  All right.  That motion is granted.  That

5   does not change the advisory guideline range because the Court

6   anticipated the making of the motion and the granting thereof.

7            Mr. Denenfeld, have you had the opportunity, sir, of

8   reviewing the presentence report with your client?

9            MR. DENENFELD:  I have, your Honor.

10            THE COURT:  And does defense have any objections that

11   have not already been taken care of?

12            MR. DENENFELD:  We do not, your Honor.

13            THE COURT:  Mr. Studabaker, is that correct, sir,

14   you've had adequate time to review the presentence report with

15   your lawyer, Mr. Denenfeld?

16            THE DEFENDANT:  Yes, I have, sir.

17            THE COURT:  Is Mr. Denenfeld's statement correct,

18   that you have no objections; is that right?

19            THE DEFENDANT:  That is correct, your Honor.

20            THE COURT:  All right.  Thank you very much.

21            Are you satisfied with Mr. Denenfeld's work on your

22   behalf?

23            THE DEFENDANT:  Yes, I am, your Honor.

24            THE COURT:  Thank you.

25            All right.  As I said, I have a request from the

1    government for an upward departure variance.  I have a request

2    for a downward departure or variance from the defense.  The

3    Court through a notice filed on March 27, 2008, gave notice

4    that I was considering an upward departure or a variance from

5    the advisory guideline range for the reasons delineated

6    therein.  And I will hear from counsel on all of the matters

7    attendant to the sentencing at this time.

8           So, Mr. Mekaru, on behalf of the government, sir.

9           MR. MEKARU:  Thank you, your Honor.

10          Your Honor, I guess first I'll address the issue of

11   the fact that, as I so butchered, this question of the fact

12   there are two cases that have been folded into one.  And I

13   realize this is of the government's making, we have asked this

14   Court to consider consolidated resolution of this case, and we

15   nonetheless, feel that is appropriate, it's a good use of the

16   government's resources as well as the Court's resources to do

17   this.  But I do realize by doing this we have created a number

18   of issues for this Court's consideration, and for sentencing.

19          Now, you've asked-- you've asked us to brief this

20   question of the impact of 5G1.3.  Now, 5G1.3 generally deals

21   with a situation where you have an undischarged term of

22   incarceration, where defendant is still serving custody time

23   under some other-- in some other jurisdiction or as relates to

24   some other case and they are now before this Court.  That is

25   not the situation we have here.  Mr. Studabaker has completed

1    his sentence in England.  He is in custody right now solely

2    based on the fact that he is charged in the Western District of

3    Michigan and the Eastern District of North Carolina.  So what

4    we have instead is a discharged term.

5          Now, in most instances where have you a discharged

6    term of incarceration, that falls just in the general category

7    of prior criminal history.  It is only if there is some overlap

8    between the prior, for example, prior state case and the

9    instant federal case.  Or in this particular case, some overlap

10   between the case in England and the case before you that

11   perhaps there is some sort of consideration that should be

12   given to the defendant.  And I believe that is, not to speak

13   for Mr. Denenfeld, but I believe that's where counsel has asked

14   for this Court, under the commentary, to consider a departure,

15   because the commentary does authorize this Court to give some

16   sort of credit for that prior term of incarceration.

17          Now, that said.  First with respect to the case in

18   England.  The charges in England do overlap the charges that

19   were brought in this district, but not entirely.  The charges

20   in England were for inducing an act of gross indecency, and

21   abduction of a minor.  Now, that was not kidnapping.  It was

22   essentially the taking of a minor from her parents without

23   their permission or authority.

24          The charges we have in Michigan deal with coercion or

25   enticement and also include the act of traveling from the

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    United States overseas and actually committing a sex act.  The

2    charges in England could not address the fact that the

3    defendant had sex or raped this 12-year-old girl in France.

4    The French authorities could have jurisdiction over that, but

5    not in England.

6           Now, in response actually to this case, the English

7    authorities have since enacted new laws to address this very

8    conduct.  But nonetheless, the prosecution in England did not

9    address the fact that the sentence in England did not address

10   the fact that the defendant had raped a 12-year-old girl, and

11   that's what we have before you today.

12          Now, I do understand though that the overall facts of

13   the incident in England is identical to the facts you have

14   before you in the Michigan case.  And perhaps if that was the

15   sole matter before this Court, there might still be some room

16   for some consideration for the defendant.  Set that aside.

17   North Carolina.  The North Carolina case deals with child

18   pornography.  The English prosecution had no bearing whatsoever

19   on the case in North Carolina.  There was no prosecution for

20   child pornography, no sentence imposed for child pornography,

21   no consideration given at the time of sentencing for that

22   offense.  So if we were to look solely at the case in North

23   Carolina, it would look back at this conviction in England

24   purely as just prior criminal history.  And as I suggested in

25   our sentencing memorandum, the supplemental, that the

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    defendant's criminal history score would be incrementally

2    higher because he would be one criminal history category higher

3    under the recommended guideline computation.

4            All right.  So that is my analysis of this 5G1.3 and

5    how it may or may not come into play in the sentencing in this

6    case.

7            Your Honor, it would be the government's position, at

8    this point, that as a consolidated case, no credit should be

9    given to the defendant under 5G1.3, and more specifically

10   5G1.3(b) is the section that could be implicated.

11           Also, just so the Court is aware, if the Court were

12   of a mind to grant credit for the time in England, the

13   defendant has served essentially a four-year sentence for the

14   criminal offense.  His date of discharge on that criminal

15   offense, his date of release was August 21st of 2006.  At that

16   moment, he was no longer in custody on a criminal case.  His

17   status in England was that of an undesirable, an individual who

18   was in the country, as far as they were concerned, unlawfully,

19   and was subject to deportation.  Now, the defendant was given

20   notice of this intent to deport and filed a notice-- his own

21   notice of appeal.  From August 21st, 2006, until his return to

22   the United States in 2007, it was June 2nd, 2007, his custody

23   in England was for an immigration matter, not on any sort of

24   criminal charges.  So if this Court were of a mind to grant the

25   defendant some sort of consideration for time, there is

1    absolutely no overlap between his UK sentence of incarceration

2    on a criminal case-- excuse me, there is no overlap between the

3    deportation immigration matter and the criminal charges.

4            All right.  Now, to this question of the defendant's

5    sentence.  Your Honor, it's the government's position that an

6    advisory range is 70 to 87 months does not adequately reflect

7    and adequately address the defendant's conduct and that a

8    departure is appropriate.  Primarily the government's concern

9    here has to do with the defendant's prior history of trolling

10   for children and grooming children and are concerned of his

11   future risk.

12           Now, the guidelines under 4B1.5 and under 2G2.2, we

13   will address this pattern question, but that is a very narrow

14   definition.  And as this Court has already ruled, given the

15   limited facts that were available regarding the 1998

16   conviction, that this Court would have some difficulty in

17   scoring that enhancement based on those limited facts, so we

18   understand that, but nonetheless, felt there might be

19   sufficient evidence for the Court's consideration.

20           But setting aside what is specifically enumerated and

21   scored under a guideline, let's consider overall under 3553,

22   the nature of this individual.  What has he demonstrated for

23   us?  Your Honor, the defendant is interested in children, and

24   he is interested in children as objects for sexual desire.

25           Now, how can I make that declaration?  Because the

1   defendant groomed an 11-year-old girl from England, took this

2   child and accelerated her maturation and her sexual knowledge

3   so that when he actually met her in person, he already laid the

4   groundwork for her to be a willing participant in his sexual

5   exploit.  This is a child who was 12 years old.

6           Now, in addition to this victim, we have prosecuted

7   the defendant for raping.  Law enforcement has determined that

8   this isn't the only instance where the defendant has gone out

9   seeking a child.  The defendant used the internet, cast a wide

10  net looking for children who were vulnerable.  He was able to

11  establish an internet relationship with a child in Australia,

12  who was 10 years old.  Two more internet relationships that we

13  have been able to identify with girls in Newaygo County, who

14  were 11 years old.

15          Now, what we found out through the investigation is

16  that the victim in this case, S.P., originally met the

17  defendant through the website called Neopets.  Now, as we have

18  briefed this Court and provided information, Neopets is a

19  website that caters to children.  Their own records and their

20  own demographics indicate that the vast majority of their users

21  are minors, and a substantial portion of their users are under

22  the age of 12, very young children.  And the defendant's

23  meeting, frequenting this website and meets S.P., who is 11

24  years old.  In addition, he also met a child who was in

25  Australia, and she was 10 years old, through Neopets.


KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1          What is a man who is 31 years old doing trolling

2     around at a website designed for children?  Now, he can say

3     well, there are other adults who are interested in this.  This

4     could be something other adults are interested in, perhaps, but

5     perhaps instead it's because the defendant has an interest in

6     children and this is his way of getting access to them.  And

7     that's borne out by the fact that he actually was able to get

8     access to S.P.

9          Now, part of the conversation he had with that girl

10    in Australia included things like, "What is the color of your

11    bathing suit?  Do you have a boyfriend?"  You're asking a

12    10-year-old, do you have a boyfriend?  Are your parents around?

13     Is your mom around right now?  Are you alone?  That became

14    important for him to be able to separate her from her parents

15    so he could have this window of communication that was

16    unsupervised.

17          The defendant again established his relationships

18    with these other girls up in Newaygo.

19          Now, I understand the defendant was serving this

20    country, and perhaps as part of the school program that he was

21    communicating with these children who were encouraged to have

22    communications with soldiers serving overseas.  Okay, that's

23    possible, sure.  But again, your Honor, it's like looking at

24    this Neopets website, it's a legitimate website, this

25    communication with children and soldiers is a legitimate

1   program, but instead the defendant used these programs to his

2   advantage.

3           Now, not only just communicating with these girls,

4   but again, trying to establish relationships with them to go

5   meet them to the point where one of these girls is making notes

6   and talking about how she loves Toby.  What I find troubling

7   about that statement is saying, "I love Toby," is that that is

8   the exact same statement that I saw from S.P.  Again,

9   handwritten notes, "love Toby."

10          While adults can differentiate between a parent's

11  love for a child, an adult's fondness for a child, a child's

12  understanding of what is encompassed and what is meant by love

13  can be turned upside down by an adult who is grooming that girl

14  to believe that not only is it love as an emotion as something

15  that you want to care for and protect, but it's love as an

16  avenue for sex.  And what we saw with the chats with S.P. was

17  exactly that, where this young girl is talking about this

18  romanticized notion of what she thought love might be,

19  caressing the hair, oh, isn't that lovely.  And then the

20  defendant is talking about groping her and his digital

21  penetration of her vagina.

22          It is the government's estimation that this defendant

23  poses a risk, and will continue to pose a risk to children, and

24  that his conduct at this point warrants a sentence that is

25  greater than this recommended range.  And that his danger to

file:///A|/studabaker.txt

14

1   the community requires this Court to consider a sentence above

2   the recommended range.

3          Now, today I was provided information by Deputy

4   Gelement, and he was provided information, I believe, by a

5   Kalamazoo Sheriffs Department.  On one hand when I received it

6   and read through the report, I kind of scratched my head and

7   wondered what exactly was the significance of this.  I believe

8   the Court has been provided a copy, but if I may for the record

9   purposes at least establish my understanding is that the

10  defendant, Toby Studabaker, re-established an old relationship

11  with a woman by the name of Jennifer, last name escapes me,

12  Davis-- Jennifer Davis.

13         As I understand, Ms. Davis is blind or sight impaired

14  and hearing impaired, and that while she may dispute this

15  notion, it's my understanding that she's also suffering from

16  some mental disability.  Now, we have spoken with her mother,

17  Patricia Newman, who has confirmed her physical disabilities as

18  well as her mental disabilities.  Now, what I understand is

19  that Mr. Studabaker and Ms. Davis have been talking about

20  future plans, potentially even a marriage, and that he wants to

21  have some future relationship with her.

22         Now, Ms. Davis is an adult, I think she's perhaps

23  30-- in her thirties, which could be just fine.  I think Mr.

24  Denenfeld has also done some investigation into this question

25  of the relationship as to whether there is much tension between

file:///A|/studabaker.txt (15 of 57) [10/9/2008 11:17:16 AM]

1   Ms. Davis and Mr. Studabaker, I don't know quite what to make

2   of it.  As I understand it, there is some relationship, and

3   there was some desire to have a life together.

4          Now, what I find, as a prosecutor, troubling about

5   that situation is the fact Miss Davis has four children, all

6   young children.  It has been my experience in these cases that

7   it's often true that defendants or offenders who have a sexual

8   interest in children will befriend women, single women who have

9   children in the home.  Why?  Because that gives them access to

10  those kids.

11         Now, I don't know if the defendant realizes this or

12  not, and it's been-- we have been advised that maybe he is not

13  aware of this, but three of those children are no longer in Ms.

14  Davis' care and custody or in any way under the care, custody,

15  and control of her family.  They have all been adopted by

16  others.  There remains one child though who is still within the

17  family, and as I understand it, this child's first name begins

18  with S, is in the care of Ms. Davis' mother, Patty Newman.

19  This girl is seven years old.

20         As I understand it, and speaking with my agent, he

21  had contacted Ms. Newman, that Mr. Studabaker will often call

22  to speak with Ms. Newman, and then will inquire about S, "How

23  is she?  How is she doing?  May I speak with her?"  And will

24  have conversations with her quite regularly on the phone.

25         Your Honor, that strikes me as much of the same

1    conduct as I had seen with S.P., this girl in England, the

2    10-year-old child in Australia and these 11-year-old girls up

3    in Newaygo.  Again, the defendant having an interest in a young

4    female.  She's seven years old.

5         The defendant--  Well, here's what I also

6    understand:  That, according to Ms. Newman, at some point

7    someone had initiated an inquiry with the State of Michigan

8    asking about getting benefits, government benefits for S when S

9    gets back into the custody of her mother, Ms. Davis.  So it is

10   somehow planned out that this child will be removed from the

11   grandparent and come back into the home with her biological

12   mother, in a home that apparently the defendant will share.

13   Now, Ms. Newman has indicated that's not something that she

14   initiated, and as she understands it, that's not something that

15   Ms. Davis initiated nor any other family member.  The only

16   other person who knew about this relationship and the fact that

17   Ms. Newman had custody of this child was Mr. Studabaker.  I

18   realize this is some speculation on their part, but they,

19   through the process of elimination, have determined that it

20   would be Mr. Studabaker would be the one who would be driving

21   this.  Now, it's possible that his fiance, Ms. Davis, could

22   have had a part in this too.  But again, what that does is puts

23   Mr. Studabaker back into anticipating his release from custody

24   at some point in a home with a child that he could have access

25   to.  He serves another few years, say 70 months, credit for

1   four years, he could be out in another two, she would be nine

2   years old.

3          Now, I've also been told there is some unfortunate

4   information about this child's health.  According to Ms.

5   Newman, the child is suffering from what she described as a

6   brain tumor.  She may be, as I understand it, terminal.  And

7   again, the other information that we had is Mr. Studabaker may

8   or may not have been aware about the other three children being

9   no longer in the home.  So that's what we have been sorting out

10  through today.

11         What other sort of information do we have of recent

12  conduct where the defendant is continuing to try to have a

13  contact with children, he tried to contact S.P.,

14  he sent her a letter, a card.  That was intercepted by the

15  authorities in England.  But this was after his sentence, after

16  he was already incarcerated.  He's continuing to try to

17  communicate with S.P.

18         While this defendant has expressed in his presentence

19  report an understanding of going through sex offender treatment

20  of a better understanding of himself, it doesn't appear he has

21  had a better understanding of what his actions have on others.

22  Imagine the impact on this child to receive out of the blue a

23  letter from the defendant, this offender, where she's got these

24  mixed emotions about someone who she expressed her love for,

25  and it may have been entirely heartfelt on her part, and she's

1    being told that rather than a relationship that she was used or

2    raped and then gets a letter from him.  Only opening again this

3    scab, all the pain and suffering that she's gone through by

4    getting another letter from him.  And that doesn't strike me as

5    an individual who understands what he's done, understands that

6    what he's done has turned this poor girl's life completely

7    upside down.

8            Your Honor, I have attached, as part of our

9    sentencing memorandum, the letter from the victim's family.  I

10   don't know if I can any better address or speak to the impact

11   the defendant's conduct has had on that family.  But I did note

12   that this poor family was thrown into a media firestorm.  Now,

13   is that his-- or is that his fault?  Well, as far as I'm

14   concerned, yes.  Because he is the one who committed the act.

15   And what he started were consequences and were events that were

16   directly attributable to the fact that he took a 12-year-old

17   girl from her home and decided to take her to Paris and to

18   France and Germany and created a huge uproar.

19           Now, I realize there was some bad press for the

20   United States, but we are a country.  We are what, the sole

21   remaining superpower.  We get bad press all the time.  We

22   should expect that.  That's fine.  But not for the family, not

23   for this poor girl.  This child's face was plastered all over

24   every single publication in the United Kingdom as a consequence

25   of what this defendant has done.

 1          Your Honor, I think I've taxed perhaps this Court's

 2     patience, and I thank you.  I've been speaking quite awhile.

 3          Your Honor, I don't know ultimately how much time

 4     this individual should serve, that's for this Court.  But my

 5     sense of what is a just sentence does not fall within this

 6     range of 70 to 87 months.

 7          Your Honor, as this Court has seen with more recent

 8     prosecutions where, understandably so, the statutes have

 9     changed or the guidelines have changed, I think there is a

10     recognition that these offenders and these offenses must be

11     addressed seriously and must be punished to the point where

12     other people-- others are deterred and that the specific

13     offender, the offender who is before this Court is deterred

14     from future misconduct.

15          Thank you.

16          THE COURT:  Thank you, Mr. Mekaru.

17          Mr. Denenfeld.

18          MR. DENENFELD:  What is most remarkable about what

19     the government says in writing and orally is that they have

20     presented virtually no evidence in support, and yet they have

21     made serious allegations on a hot button issue, namely, having

22     sex with children.  And I hope that the Court will hold the

23     government to its proofs before the Court decides to make a

24     significant upward departure.

25          Let me take them one at a time.


                KATHLEEN S. THOMAS, U.S. District Court Reporter
            410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

```
 1              The girl in Australia, while I would suggest to the
 2      Court that was downright disingenuous for the government to
 3      include the statement from the 10-year-old girl, but not to
 4      include the statement from the mother.  The mother, who
 5      actually says that the first contact that Mr. Studabaker made
 6      on this Neopets was to ask whether there were any mature people
 7      out there.  The mother who says that she developed a
 8      relationship with Mr. Studabaker in which they talked about
 9      adult topics ranging from the death of Mr. Studabaker's wife
10      while he was in the service to other kinds of family issues.
11      The mother who says that even after some discomfort with
12      Mr. Studabaker's conduct, the family still sent him a Christmas
13      card.
14              Then the government throws in these two girls in
15      Newaygo County.  Those would be the two girls in Newaygo
16      County, where after an investigation, there was a conclusion
17      reached that nothing inappropriate occurred.  That nothing
18      inappropriate occurred.
19              And then the most recent thing, this-- first of all,
20      I have to tell the Court, not surprisingly, I get a little bit
21      nervous when people are tossing me reports as I walk into a
22      sentencing, but let me at least tell you what I know about this
23      report.  Ms. Davis contacted me in my office and we had a
24      conversation with the use of a hearing impaired assistance
25      operator.  Ms. Davis was very concerned about the case, wanted
```

file:///A|/studabaker.txt

1    to know what I believed Mr. Studabaker was looking at

2    sentence-wise, indicated to me that the two of them had

3    re-begun a friendship that they had started all the way back in

4    high school.

5           And with respect to her mother, Ms. Newman, I'm not

6    quite sure what to say about that, because one of the lawyers

7    in my office, who is present here today, spoke with Ms. Newman

8    when Ms. Newman agreed that she would, in fact, be power of

9    attorney for Toby Studabaker, and we drafted that for the

10   client, and we ended up transmitting that to the bank where

11   Mr. Studabaker has an account.  I believe actually that went

12   badly after Ms. Newman cleaned out the account by using the

13   power of attorney.  Why Ms. Newman is suddenly making reports

14   to the police, I can't address.  I simply don't know the

15   answer, but I know I had personal contact with Ms. Davis, and

16   it's quite different from what I'm reading here today.

17          The bottom line is that there has been very little,

18   if any, credible, reliable evidence that has been presented to

19   you.  And the government is making statements like a prior

20   history of trolling for children.  I haven't heard any evidence

21   that suggests such a prior history.  Grooming children.  Well,

22   besides the S.P. matter for which he has already

23   served prison time and will no doubt be serving more, I haven't

24   heard any evidence of that either.

25          I've already addressed the Australian 10-year-old,

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    and the fact that her mother seemed to have been as much of

2    that relationship as was the 10-year-old.  The Newaygo County,

3    which seems to have had an airing and an investigation, and

4    which the conclusion was that nothing inappropriate had

5    occurred.  It's almost like the 1998 St. Joseph County one,

6    which the government actually tried to piggyback onto a

7    five-level increase, even though it's unclear as to whether a

8    charge was ever even brought, and if a charge was brought, it

9    was promptly dismissed for insufficient evidence by the

10   prosecuting official.  Boy, I would suggest that if we are

11   going to start increasing sentences on the basis of that kind

12   of evidence, that that would be troubling indeed.

13         With respect to the 5G1.3, I think, I honestly

14   acknowledge to the Court, I don't think 5G1.3 deals with this

15   situation.  I would like to be able to make an argument that it

16   does, but I don't think it does.  But I also believe that when

17   you compare Count One with, in this case, with what

18   Mr. Studabaker served time for in the UK, they are virtually

19   identical.  I won't quibble with Mr. Mekaru, it's true the

20   elements may be different, but the bottom line is the facts are

21   identical as to what led to it.

22         Then let me address the child pornography in this

23   way:  We established, and I'm sure the Court read the plea

24   transcript, a very narrow factual basis for that.  In fact, it

25   was difficult to establish a factual basis.  But Mr. Studabaker

1    did acknowledge under oath that he was aware of the existence

2    of child pornographic images on the hard drive and that was

3    enough to satisfy the statute.  Mr. Studabaker has steadfastly

4    maintained, and I don't think anyone has seriously questioned

5    it, he was not the person who downloaded those images.  The

6    computer was being used in an army barracks in which a number

7    of people had access to it, etcetera.

8            The North Carolina charge was a charge that everyone

9    believed should have been disposed of in this case as well, it

10   wouldn't have made sense from the defense standpoint to have

11   Mr. Studabaker resolve this case and then have to have defended

12   himself in North Carolina, and so a plea bargain was reached,

13   and Mr. Studabaker stands by it.  He did acknowledge that he

14   had knowledge of the existence of the images.  But I would

15   suggest to you that that is pretty limited involvement in a

16   typical child pornography case where you're talking about

17   somebody who was clearly intentionally going out and

18   downloading images, which is not the case here.

19           I acknowledge again, and I acknowledged in what I

20   wrote, that the child pornography charge was not taken into

21   account in the UK.  Again, I wish I could argue otherwise, I

22   can't.  But I would suggest that, as I think even Mr. Mekaru

23   just acknowledged, the child pornography count here is

24   significantly less severe, particularly given the circumstances

25   of Mr. Studabaker's limited involvement and that he should be

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    given some credit for the four years.

2            I also want to acknowledge, as I did in the footnote

3    in what I filed, that it's true that a significant portion of

4    the four years was based upon immigration holds while

5    Mr. Studabaker's solicitor ended up making various appeals

6    having to do with double jeopardy, the protections that are

7    quite different in Europe than they are in the United States.

8    Ultimately that appeal was lost and he was transported here.

9    But I would suggest if it walks like a duck and talks like a

10   duck.  The bottom line is, he was locked up for four years as a

11   result of the UK conviction.  And I'm sure it didn't make much

12   difference to Mr. Studabaker as to what he was being locked up

13   for, he was still being locked up in the very same place as a

14   result of his conduct.

15           Look, Mr. Studabaker has never made any excuses here,

16   and I don't think he will when he has an opportunity to speak

17   to you today.  He knows that what happened was serious.  He

18   knows that it was wrong.  But I would also point out to the

19   Court that he completed a sex offender treatment program while

20   in the UK prison, a program that was completed incidently after

21   he tried to write that letter to Ms.-- or to S.P., however we

22   are referring to her.  And again, I would suggest that the

23   letter was a clumsy attempt to try to make her feel better.

24   Mr. Studabaker is not mister sophistication, I think it's fair

25   to say that, and it was a clumsy attempt, but I don't think

1   there's anything to suggest that he was trying to in any way do

2   anything except apologize and make her feel better for his

3   misconduct.

4           I just don't see how the existing guideline range has

5   not taken into account the details of this crime.  And if you

6   look at the guideline calculation, every act that occurred here

7   was, in fact, scored and did, in fact, result in the guideline

8   calculus that we have.  I understand the law may have changed,

9   but this Court knows, as well as I, that we take the law that

10  applied at the time the act was committed.  I think

11  Mr. Studabaker is already looking, when you combine the UK time

12  with the time that he is facing here, a significant prison

13  sentence.  If he has already done four years, he is looking at

14  the potential of more than seven additional years.  It's not as

15  if Mr. Studabaker is going to walk away getting a tap on the

16  wrist.  That's a significant sentence, a double-digit

17  sentence.  And I would suggest that the government has simply

18  failed to present sufficient evidence to prompt the Court to

19  actually somehow grant an upward variance.

20          It's frankly, troubling to me that some of these

21  allegations are being made and, you know, as Mr. Mekaru was

22  talking, I wrote down a couple of terms that he used several

23  times, maybe, perhaps Mr. Studabaker may or may not have known

24  about this seven year old.  Now, well, you know what, you know

25  we are talking about imprisoning a person for longer than what

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    is already a significant amount of time.  And I would suggest

2    to the Court that maybe, perhaps and Mr. Studabaker may or may

3    not have known, is simply not sufficient.

4           Thank you.

5           THE COURT:  All right, Mr. Denenfeld, let me ask you

6    a couple questions here.

7           As it relates to the documents that I've seen from

8    the Australian parent.

9           MR. DENENFELD:  Yes.

10          THE COURT:  Directing your attention to what I think

11   is Page 4 of that document.  You indicate that in your

12   colloquy, that there is no connection between these two

13   youngsters, the youngster in Great Britain and the young person

14   in Australia, but a couple of statements in the parents'

15   statement jumped out at me as being reminiscent, shall we say,

16   of the contact with S.P.  The top of the first complete

17   paragraph on Page 4.  "Toby began to request to chat with Erin

18   more and more often.  I found this a little odd."  Jumping down

19   to the next paragraph.  "Often when I logged onto the computer,

20   Toby would also get on line and make contact with me.  Almost

21   immediately he would request to speak with Erin.  I recall one

22   occasion Erin told me that Toby asked her what she was

23   wearing."  This is, as I understand it, a 9 or 10-year-old

24   child.  "I thought that was a strange question to ask a

25   9-year-old girl.  Erin also told me that Toby would ask her

1   whether her mom," meaning I presume that is English for mother,

2   "or dad or anyone else was in the room."

3         Now, those sorts of comments or questions don't

4   impress me as being-- I don't think you can interpret those,

5   and come back at me if you disagree with me, interpreting those

6   in context, don't they seem troubling similar to the

7   communications with S.P.?

8         MR. DENENFELD:  As I think I indicated in my filing,

9   your Honor, there is no question that in those two paragraphs

10  the mother seems to be describing a certain level of discomfort

11  about Mr. Studabaker's actions during that period of time.  But

12  I think a couple of things are worth noting.  First of all,

13  apparently even after the conduct that she's describing, the

14  family sent him a Christmas card.  Apparently at the time they

15  were not disturbed enough to have taken any action to cut off

16  the relationship.  And in fact, she then describes ultimately

17  the relationship sort of ending as Mr. Studabaker started

18  talking about S.P., I think her initials are.  But I would also

19  suggest to the Court that the statement, of course, was drafted

20  by law enforcement, and was drafted by law enforcement after

21  the fact.  And, of course, when she then found out-- the mother

22  I'm talking about-- that there was inappropriate conduct with

23  this British young girl, my sense is that she probably then

24  went back and started putting a different gloss on things.  But

25  what we do know is that while there was a level of discomfort,

file:///A|/studabaker.txt

1  they did not cut off the relationship.  They apparently did not

2  feel so uncomfortable that it was time to stop allowing

3  Mr. Studabaker to have contact with Erin.  And again, they

4  apparently even sent a Christmas card for which Mr. Studabaker

5  tried to repay them with a gift of a camera, which ultimately,

6  I can't remember whether or not they accepted it or not, but I

7  certainly do acknowledge those two paragraphs.  And I don't

8  know how analogous they are to the S.P. specific facts, but

9  clearly the issue about whether or not mom is around, etcetera,

10 is troubling.  But on the whole, I think if you look at the

11 statement by the mother, the mother clearly indicates that

12 Mr. Studabaker first initially established the contact with

13 her, after he specifically asked on the website for a mature

14 person, whether or not there were, in essence, adults out there

15 that he could start a relationship with, and that much of the

16 relationship that he had with the mother was an adult level.

17 Talking about family issues, talking about spouses, talking

18 about the loss of his spouse.

19      So I acknowledge that those paragraphs are

20 troubling.  But I think on the whole the statement by the

21 mother suggests that there was a significant amount of contact

22 that was going on on an adult level as well.  And I would

23 suggest to you that if Mr. Mekaru is right, and that if

24 Mr. Studabaker really doesn't have any reason to go on this

25 website unless he is trolling or grooming for kids, it would be

file:///A|/studabaker.txt (29 of 57) [10/9/2008 11:17:16 AM]

file:///A|/studabaker.txt

1  kind of odd to make your initial contact asking for adults out

2  there that you could establish a relationship with to talk

3  about adult topics.

4          THE COURT:  Do you wish to address in any way the

5  factors that were noticed on my notice of consideration for

6  upward departure or variance, and if you do, that's fine, if

7  you don't, that's okay, too.

8          MR. DENENFELD:  I tried to essentially cover a lot of

9  what I viewed as the concerns that the Court had about this.

10  So if you have questions about particular factors or issues,

11  I'm certainly happy to address them more specifically.

12          THE COURT:  All right.  I don't have any questions at

13  this point.

14          MR. DENENFELD:  All right.  Thank you, your Honor.

15          THE COURT:  Thank you.

16          Mr. Studabaker, is there anything you wish to say in

17  your own behalf, sir?  You can stand at the podium or remain

18  seated, whichever you wish.

19          THE DEFENDANT:  Yes, sir.  I would like to speak to

20  the seriousness of everything that's gone on.  It's

21  inexcusable.  Having four years, going on five years now, to

22  sit and think about everything that has gone on, and looking at

23  which way my life was going at that time, there is no excuse

24  for what I've done.  None at all.  And I'm not making any

25  excuses.

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1            Being over in England and doing the extensive course

2     that I done, the sex offenders treatment program, you know,

3     when I wrote those letters, it was before I started doing the

4     treatment program, and they came to me promptly and talked to

5     me about this and it was those that made me decide I needed to

6     go into this program to have a look at myself and see where I

7     needed to work on to keep myself from going back down this road

8     that I took, because I don't want to stand in front of you or

9     any other judge and have to explain myself again for actions

10    that aren't excusable.

11           The North Carolina, I knew they were on there, and I

12    should have done something about it, and I didn't.  It was my

13    responsibility, it was my computer, and I didn't take

14    responsibility.  I don't know what else to say about that.

15           THE COURT:  So there is no link between the

16    communications with S.P. in Great Britain and the fact that

17    there was child pornography on your computer?

18           THE DEFENDANT:  No, your Honor, no link.  I didn't

19    download those.  I don't know who did.  Like I said, when I saw

20    them on there, I became disturbed that they were on there, but

21    I didn't take what I thought were the necessary steps.  I tried

22    to get rid of them.  You know, it wasn't until I was about

23    ready to get out of the Marine Corps that I had saw those, and

24    I thought through deleting them or getting rid of them, trying

25    to erase the hard drives off there that that was, you know,

1    that was adequate.  I didn't know exactly who I was supposed to

2    go to for that.

3           THE COURT:  Well, how about your commanding officer?

4    If there were fellow Marines doing it, how about your

5    commanding officer?

6           THE DEFENDANT:  One thing that we-- that's--  It's

7    hard to tell on people that have to watch your back when

8    you're, you know.  I was in Afghanistan, and to tell on those

9    people, not knowing exactly who it was, you know, I didn't

10   know, you know, I didn't want to get the wrong person in

11   trouble.  I didn't--  So I thought was I did what I thought

12   would take care of the problem.  And I wanted to get rid of the

13   computer because I was getting ready to leave anyway, and I

14   didn't want those on there.  I didn't want anyone else to see

15   those.  And not knowing exactly who it was that downloaded it,

16   I don't know-- I didn't know who exactly to go to about it.  I

17   didn't know who to tell and say, you know, give a specific

18   person who done it.  I wish I had.  I only wish I had, because

19   whoever did do it is still out there, is still doing this, and

20   that's where I failed, because I could have prevented more, you

21   know, if this person is doing more, and if carried on and taken

22   this further, you know, I could have stopped it.  But yet here

23   I stand in front of you trying to--  No excuses, just no

24   excuse.

25           You know, I can say sorry until I'm blue in the face,

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    but it doesn't cover what I've done.

2         Remorse.  Do I have it?  Yes.  I think about

3    everything that I've done every day when I sit in that cell,

4    and what I could do to keep from going down this road.  I

5    wanted to go into more extensive counseling.  When I go--

6    wherever I get placed at, whatever institute I go to, I want to

7    get more psychological counseling to deal with the things that

8    have happened, like the death of my wife and the abuse when I

9    was younger myself, you know, the things that I haven't

10   addressed that could be factors that contributed to this, and I

11   don't want to go down that road again, I really don't.  I don't

12   want to hurt anyone else like I've hurt-- the way I've hurt her

13   and her family.

14        One thing we learned in those-- the course, was

15   called a ripple effect.  Throwing a stone into a pond and

16   seeing the, you know, when you throw a stone in a pond it

17   doesn't just stop right there at the point of where it entered,

18   it ripples out, it touches everything else, and that's what

19   happened here.  You know, I hurt her.  I hurt her family.  I

20   hurt my family.  I hurt my country.  You know, it doesn't

21   stop.  It just keeps going.  And I don't want to do that

22   again.  I don't want to stand in front of you or in front of

23   another judge and have to explain myself again why I'm here.

24        I want to be able to get through-- get the counseling

25   that I want to do, get a better education and get a job to

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    where I can keep myself occupied and keep my mind occupied and

2    work on my relationships with my family, with friends, that I

3    know I'm going to have to rebuild, and it's going to be a long

4    road, and I don't expect it to be something that will be done

5    right away.  But all I know is I don't want to end up here.  I

6    don't want to hurt another person like I've hurt her.  Not

7    again.

8            I don't know what else I can say, your Honor.  You

9    know, I just thank you for giving me a chance to get up and say

10   at least that and know that, you know, this comes from, I

11   didn't have anything written down, I sat and tried to think of

12   something and, you know, I can write down all I want, but

13   that's coming from a piece of paper, but I want this to come

14   from me, from my heart, and to know that I mean what I say.

15   And, you know, that I don't want to recidivate, you know, end

16   up being back here.  Nothing I have done is worth being back

17   here.

18           Thank you, your Honor.

19           THE COURT:  Thank you, Mr. Studabaker.

20           Mr. Mekaru, did you have anything further?

21           MR. MEKARU:  Your Honor, Mr. Studabaker has

22   repeatedly said he does not want to go down that road again,

23   doesn't want to hurt anyone else.  While I think he is being

24   honest when he says that that's a risk of anyone else.  What I

25   don't think he is being honest with respect to this child

1  pornography.  I don't think he is being honest that he has a

2  sexual interest in children.  That is the risk.  That's what he

3  doesn't want to do again.  That's what he has to control.

4  That's what counseling is supposed to be addressing.  That's

5  where you learn about avoiding triggers.  That's where you

6  learn about this cognitive behavior that you need to address

7  the potential for recidivating.

8         The defendant, I think it said somewhere in here, I

9  was looking for it, that he didn't have any sort of sexual

10  interest in children.  I don't see a 12-year-old child as being

11  a woman.  That's a child.  That's a sexual interest in

12  children.  That is the risk.

13         So anyway, your Honor, I hear the defendant's

14  statement regarding this child pornography, and I find it

15  disingenuous.  He knew it was on there.  The images, we have

16  full file path information for those images, they weren't

17  deleted.  We were able to match up file names.  Once images are

18  deleted and they go into like space, a lot of information just

19  gets all-- we had all of that.

20         Two more points, your Honor.  Regarding the St.

21  Joseph County case as being immediately dismissed.  I realize

22  counsel is not privy to all the information the government

23  had.  But what happened in that case, your Honor, was that the

24  victim and her family moved out of state.  My recollection is

25  either Kentucky or Tennessee.  St. Joseph County is a small

 1    county, did not have the financial wherewithal to continue the
 2    prosecution where they would have to bring the victim and the
 3    witnesses back from out of state to continue a prosecution.
 4    Now, is that a lack of evidence?  Perhaps.  But I did not want
 5    the Court to think that it was somehow deemed to be wholly
 6    unbelievable.
 7            Lastly, your Honor, again going back to this attached
 8    report.  Your Honor, we have as attached to this memorandum a
 9    report that clearly identifies a child.  We have made efforts
10    obviously to use only initials, as required by the local rules,
11    and in addition to the Rules of Federal Procedure to use
12    initials, I realize it was unintended by counsel, I mean no
13    criticism along those lines, but I would ask we perhaps
14    consider sealing that document.
15            And I also now with that said, I do realize that in
16    the government's own filing that we have included headlines
17    from papers where the child's name is clearly stated.  I found
18    it difficult for myself to redact a newspaper, so I didn't do
19    that.  But I do note that there was an instance where the
20    government itself was also filing and making notice of the
21    child's first name, but I didn't want to be accused of somehow
22    censoring the press by redacting, so that's kind of where we
23    stood.
24            But with respect to Erin-- excuse me, with respect to
25    the child in Australia, I do know, your Honor, as this Court

1    was reviewing the report from the mother, in addition to this

2    notion of sharing Christmas cards, the defendant wanted to send

3    the child a web cam so he could see her.  Your Honor, again, I

4    look at that as a continuing desire of the defendant to have

5    more and more access to a child.  With a Web cam he could

6    actually see her, she could see him, in our summation, for

7    further grooming

8            Thank you.

9            THE COURT:  Thank you.

10           Mr. Denenfeld, I'll give you another chance, if you

11   wish.

12           MR. DENENFELD:  Only to remind the Court on the child

13   pornography thing, the way the child pornography was found on

14   that computer was because the pizza delivery man, who

15   Mr. Studabaker sold the computer to, as he was leaving Camp

16   Lejeune, apparently discovered it.  And my impression is that

17   Mr. Studabaker did actually, in fact, try to delete those

18   files.  But I would simply remind the Court that this was

19   simply him selling a computer to a person who was trying to buy

20   a computer, and there was nothing more nefarious than that.

21   And I assume most of us, if we were aware of any kind of

22   pornography or sexual images, would probably try to take care

23   of those before sale, and my impression is that that's true.

24           With respect to the other things, I think I've made

25   my point.  I simply believe that there has to be some

```
 1    reasonable level of evidence before the Court should increase

 2    sentences.  And I think the evidence here, while in places

 3    could certainly be interpreted in a way that would-- that would

 4    result in some concern about the way Mr. Studabaker acted in

 5    some, particularly given the number of law enforcement

 6    investigations that went on, and a number of these in which

 7    nothing resulted, no prosecutions resulted, no charges, let

 8    alone convictions, that I would ask the Court to simply proceed

 9    cautiously.

10          Thank you.

11          THE COURT:  Thank you, Mr. Denenfeld.

12          Well, I appreciate the submissions that I received

13    from all parties on this case.  This is a difficult case, to

14    say the least, and I appreciate the assistance of the attorneys

15    with their submissions.

16          The Court's duty is to impose a sentence sufficient

17    but not greater than necessary to comply with the purposes of

18    sentencing set forth in 18 U.S. Code 3553(a).  The Court

19    recognizes that the guidelines are advisory to the Court, but

20    the Court has taken the advisory guidelines into account as an

21    initial benchmark or starting point when sentencing in this

22    case.

23          I have from the government a request to upwardly

24    depart or impose an upward variance.  I have a request from the

25    defendant to vary downward for the reasons stated in their
```

1   papers.  And this Court, on March 27th, as I've already

2   referred to, filed a notice that I was considering an upward

3   departure or variance from the advisory sentencing guidelines.

4              First, I want to say that I fully recognize my

5   discretion under the new line of Supreme Court cases to depart

6   from the sentencing guidelines or vary from the advisory

7   sentencing guidelines pursuant to the 3553 factors.  So I am

8   fully aware of my discretion, and I'm fully aware of the fact

9   that the guidelines are just that, they are guidelines which

10  are advisory to the Court in formulating a sentence in this

11  case.

12             The 3553 factors are the nature and circumstances of

13  the instant offense, in this case, two offenses, and the

14  history and characteristics of the defendant.  The sentence

15  must reflect the seriousness of the offense, promote respect

16  for law, provide just punishment for the offense, afford

17  adequate deterrence to criminal conduct, protect the public

18  from further crimes of the defendant, provide the defendant

19  with needed medical, educational and/or correctional treatment,

20  the need to avoid unwarranted sentencing disparity among

21  similarly situated defendants, and the kinds of sentences

22  available.

23             Clearly the only appropriate sentence in this case is

24  a prison sentence.

25             The defendant has requested that the Court recommend

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

file:///A|/studabaker.txt

1   to the Bureau of Prisons that he get psychological counseling

2   while he is in the institution, and the Court will so

3   recommend.  I recognize, as I will more fully explain a little

4   later, that Mr. Studabaker has completed a program in Great

5   Britain for broadly termed sex offenders, and I fully recognize

6   that he has completed this program, but he has asked for

7   psychological counseling and sex offender therapeutic treatment

8   while he is in the institution.  I think that request is well

9   founded, and the Court will make such a recommendation to the

10  Bureau of Prisons.

11          As far as the history and characteristics of this

12  defendant, the defendant prior to his involvement in the crimes

13  that are the issue of this case, was an honorably discharged

14  marine from the United States Marines, had received awards and

15  citations while he was in the military.  He has no criminal

16  history prior to this.  He's obviously been convicted in

17  Britain, but that is generally part of the episode that brings

18  him to this court as well, but up until that time, until his

19  involvement with S.P., he had no prior criminal history.  The

20  Court recognizes that.

21          He does have a mental health history of some note,

22  the various diagnoses are set forth in Paragraphs 120 and 121

23  of the report.

24          Paragraph 123 delineates the fact that he had

25  completed the sex offender treatment program in Great Britain.

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1          He has had in the past a substance abuse issue

2    involving alcohol, and that also should be addressed, and I'll

3    make a recommendation to the Bureau of Prisons that substance

4    abuse issues, specifically alcohol, or if an evaluation

5    requires addressing other substance abuse than that should be

6    addressed as well, so I'll make those recommendations to the

7    Bureau of Prisons.

8          The report is also clear that the death of

9    Mr. Studabaker's wife had a major impact on the defendant.  I

10   take it as true that the death of his wife lapsed him into

11   depression and stress, and may have been, the word triggers is

12   referred to by Mr. Mekaru in his colloquy with the Court, might

13   have been one of the triggers to get him involved in the very

14   significant offenses for which he finds himself convicted

15   before this Court.  He asserts that his interests in

16   pornography started after his wife-- after his wife died.

17   There is really nothing in the record to show otherwise, so I

18   assume that-- I assume that statement to be true.

19         The victim in this case is a very young child, 11

20   years old when the first contact was made by the defendant with

21   the victim in July of 2002.  The victim being a resident of

22   Great Britain.  At that time, the defendant was 30 years old.

23   The contact was made through a website called Neopets and

24   through, I gather through reports, cellular telephones, but

25   generally the contact was the website from Neopets.  From the

1    report I conclude that that particular website is used by a

2    substantial minority of the total users of the website are

3    children under the age of 12.

4           Paragraph 30 of the report outlines communication

5    began with small talk issues, over time, and while I recognize

6    Mr. Denenfeld's objection to the use of the word grooming by

7    Mr. Mekaru as it relates to S.P., I think that was precisely

8    what was going on here.  This defendant was grooming S.P.  The

9    conversations became more sexually explicit to the point where

10   the defendant is sending a message to S.P. talking about

11   digital penetration of her.  Now, this at this point is a 11 or

12   12-year-old girl.  You can--  The Court concludes that over the

13   period of time there was, by Mr. Studabaker, a systematic

14   grooming of S.P. for what ultimately occurred overseas,

15   specifically in the country of France, in which the defendant

16   sexually penetrated this young girl.

17          Immediately after his discharge from the military due

18   to injuries, to Mr. Studabaker's credit, he has, as I've said

19   before, an honorably discharged marine, but regretfully and

20   tragically, immediately after his discharge, he started to

21   execute what I think was his plan-- I conclude that from the

22   report-- was his plan to have a sexual encounter with S.P.

23   overseas.  He engages in travel arrangements to meet S.P. in

24   England with planned travel to France.  He has contact with

25   travel agents where he describes S.P. as his niece, as being 12

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

```
 1   years old.  There is a ruse with the travel agent to get her
 2   passport number.  He sends S.P. money, $150 of money order, all
 3   obviously outside the knowledge of S.P.'s parents.  He meets
 4   S.P. in Great Britain and then they fly to France in which
 5   results in a sexual act performed by Mr. Studabaker on this
 6   12-year-old girl in the country of France.  He takes the child
 7   to Germany, and at that point, his crimes have become a matter
 8   of international press treatment.  He, to his credit, he does
 9   put S.P. back on a plane to England, back to her parents, and
10   he surrenders to authorities in Germany.
11          There are also, in addition to the sophisticated
12   planning that I've already laid out on the record, there were
13   other interesting points here of sophistication in terms of
14   Mr. Studabaker not being wanted to be-- wanting to be
15   apprehended by the authorities, and secreting of this young
16   person by the purchase and use of hair dye for both he and S.P.
17   to disguise their physical appearances to make it less likely
18   that they are going to be apprehended by authorities.  His
19   first reaction is to lie to the German authorities about his--
20   about S.P.'s age, describing her as being 18 or 19 which, of
21   course, that's on Page 41 of the report and, of course, she is
22   significantly younger than that.
23          That captures, I think, a significant portion of the
24   nature and circumstances of this offense, but I don't think it
25   captures-- the letter captures it very well, but I don't think
```

1    it captures another significant harm that occurred in this

2    case.  And that is the utter terror of S.P.'s parents when they

3    realized that their 12-year-old daughter is gone, and they

4    discover that she has been in internet communication with this

5    defendant.  For approximately four days, her parents did not

6    know her whereabouts.  They had no idea where their 12-year-old

7    daughter was or her fate.  They didn't know whether she was

8    alive or dead.

9              Now, fortunately for her parents, it was only four

10   days.  But the guidelines, in the Court's judgment, do not

11   adequately take into account that portion of the nature of this

12   heinous crime.  And their letter, which is part of the record

13   here, says it all;  total panic, complete fear, physically

14   sick.  S.P.'s mother had feelings of guilt for not protecting

15   her own daughter.  And most poignantly, "We can never go back."

16    It seems to me that those harms that the defendant inflicted

17   on S.P.'s parents in this abduction are nowhere calculated in

18   the guidelines adequately, which is one of the reasons why the

19   Court intends to upwardly depart from the guidelines.

20             The Court also notes that I do not believe that a

21   two-level enhancement pursuant to 2A3.2(b)(2)(B), under the

22   2003 version of the guidelines, which is presently under those

23   guidelines a two-level enhancement, that that in the Court's

24   judgment does not adequately reflect the seriousness of the

25   conduct in this case.  So I intend to upwardly depart for those

1    reasons as well.

2            As far as the possession of child pornography is

3    concerned, the defendant has 706 child pornography images.

4    There were 56 movies which depict sexual activity between

5    adults and minors.  This crime implicates another set of

6    victims.  I note that the defendant denied that he downloaded

7    these images.  I don't believe him.  I just do not believe

8    him.  The conduct that was the subject matter of the instant

9    offenses and the child pornography on his computer, in my

10   judgment, is linked, and I don't believe his assertion that he

11   is not responsible for those images being on his computer.  I

12   don't believe that for one nanosecond.

13           The Court wants to associate itself with the comments

14   made by the Third Circuit in United States vs Goff, it's a 2007

15   Court of Appeals case from the Third Circuit, which among other

16   statements says, "Consumers of child pornography create a

17   market, thereby providing economic motive for creating and

18   distributing materials."  And creating the market is the use of

19   young children to produce these dastardly materials.

20           I have very significant concerns regarding

21   Mr. Studabaker's recidivism potential.  He says he wants to

22   address it.  I hope he is sincere.  I saw him get emotional

23   while he was at the podium.  I believe him when he says he does

24   not want to recidivate.  But I think the statement in Paragraph

25   66 of the report in which he denies that he has been attracted

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

file:///A|/studabaker.txt

45

1   to minors other than S.P. is simply not true, it's not

2   credible, and in the Court's judgment, it increases

3   significantly, at least at this point when I'm sentencing him,

4   on April 21st of the year 2008, causes the Court to have

5   significant concerns about recidivism.

6          And I recognize Mr. Denenfeld's objections to some of

7   Mr. Mekaru's statements about possibly and may, and Mr.

8   Denenfeld is right on as far as that is concerned, but on the

9   other hand, I think the mother of the girl in Australia and her

10  description in the paragraphs that I referred to during the

11  colloquy with counsel are clearly an indication that he was

12  going through the same process with this girl in Australia that

13  he was going through with S.P.  Fortunately for the girl in

14  Australia, she had more parental control and awareness of what

15  was going on.  And I appreciate Mr. Denenfeld's comment in

16  representing Mr. Studabaker, that they still communicate-- they

17  sent Mr. Studabaker a Christmas card or there was some exchange

18  during Christmas.  Frankly, I think that stems more from a lack

19  of understanding by the parent of what was going on here than a

20  sincere desire to want to communicate with Mr. Studabaker,

21  because I think if they fully understood the breadth of

22  seriousness of this case, they wouldn't have sent

23  Mr. Studabaker any gifts.

24          As far as the references to the uncharged conduct in

25  other counties of-- the St. Joe County case has been referred

file:///A|/studabaker.txt (46 of 57) [10/9/2008 11:17:16 AM]

 1   to, the contact with Newaygo County youngsters has been

 2   referred to, I have disregarded that.  I just-- I think

 3   Mr. Denenfeld's point is well taken, that the evidentiary

 4   impact of that material is not sufficient for this Court to

 5   base its decision on those matters.  But I do think that the

 6   contact with the girl in Australia does have some impact on

 7   this case, and quite appropriately so, given the nature of that

 8   girl's mother's statements, and I have considered that.  But

 9   all the other stuff, including the most recent revelations from

10   Kalamazoo County, and I appreciate that came under the category

11   of breaking news, and the government and Mr. Denenfeld were

12   dealing with information that was coming at them very quickly

13   and very close to the sentencing date here, but the ambiguity

14   of that relationship with the individuals who have been named

15   coming out of the Kalamazoo County sheriff's report, again, I

16   think is material that doesn't rise to the level in which it is

17   appropriately considered by me for purposes of this sentencing

18   of Mr. Studabaker.

19          However, I do believe that there is reason for

20   departure upward of two levels for the fact under

21   2A3.2(b)(2)(B), in that I don't think the 2003 version of the

22   Guidelines appropriately takes into consideration the nature of

23   the undue influence of the defendant over the minor victim, by

24   that I mean S.P.  In addition to that, the victimization of the

25   parents is extraordinary in this case, and in the Court's

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1   judgment is not addressed adequately by the guidelines, so I

2   intend to depart upward one level for that.  And likewise, I

3   believe that for the reasons I've already stated, that a

4   combination of the need to protect Mr. Studabaker from further

5   crimes and victimizing further individuals, as well as taking

6   adequately into account the deterrence of others calls for

7   combined an additional two levels.  So the Court intends to

8   depart up five levels on Count One.  I do not intend to depart

9   on Count Two, that being the child pornography count, but I am

10  going to depart upward five levels, which results in a

11  guideline range of 135 to 168 months, which leaves me with the

12  point well taken by Mr. Denenfeld that the defendant has served

13  some period of time in Great Britain for conduct which is

14  addressed in the count of conviction in Count One of 03-291.

15  And I think that calls for some reduction from the upper level

16  of the guideline range because, if that factor had not been

17  taken into account, I would have sentenced at the upper end of

18  that guideline range of 135 to 168, but I will move to the

19  middle of that guideline range to account for the fact that

20  Mr. Studabaker has served time in prison in Great Britain.

21          Accordingly, for all those reasons, it's the judgment

22  of the Court that the defendant, Toby t. Studabaker, hereby

23  committed to the custody of the Bureau of Prisons to be

24  imprisoned for a term of 144 months in Case No. 03-291, and a

25  term of 87 months, at the top of the guideline range, in Case

1   No. 07-267.  Those sentences are to be served concurrently.

2          Upon release from prison, the defendant shall be

3   placed on supervised release for a term of 60 months in both

4   cases, to be served concurrently.  Within 72 hours of release

5   from custody of the Bureau of Prisons, the defendant shall

6   report in person to the probation office in the district to

7   which the defendant is released.

8          While on supervised release, the defendant shall

9   comply with the mandatory and standard conditions of

10  supervision including:  DNA collection, drug testing, sex

11  offender registration.  He is not to be in possession of any

12  firearms, destructive devices or dangerous weapons.

13         The following special conditions of supervised

14  release are also ordered:

15         The defendant shall provide the probation officer

16  with access to any requested financial information.

17         The defendant shall participate in a program of

18  testing and treatment for substance abuse, as directed by his

19  probation officer, until such time as the defendant is released

20  from the program by his probation officer, and shall pay at

21  least a portion of the cost according to his ability as

22  determined by his probation officer.

23         The defendant shall refrain from all use of alcoholic

24  beverages.

25         The defendant shall participate in a program of

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1  mental health treatment for sex offenders, as directed by his

2  probation officer, until such time as the defendant is released

3  from the program by his probation officer, and shall pay at

4  least a portion of the cost according to his ability as

5  determined by his probation officer.

6         The defendant shall refrain from frequenting

7  locations where minors gather.

8         The defendant shall not possess a computer system or

9  access to any Internet, including Web TV or similar services,

10 without the permission of his probation officer.

11        The defendant shall not possess pornographic

12 materials, patronize establishments where such materials are

13 sold, or possess any materials promoting the normalization of

14 criminal behavior.

15        The defendant shall not associate with persons under

16 the age of 18, except in the presence of responsible adult who

17 is aware of the defendant's backgrounds and current offense and

18 who has been approved by the probation officer.

19        The defendant shall report to the probation officer

20 all visits with relatives or friends who have minor children.

21        The defendant shall not possess or publicly display

22 any materials that may be viewed as lures for minors, as

23 determined by his probation officer.

24        The defendant shall refrain from accepting or seeking

25 civic, religious, or other voluntary positions where he would

1    be in a position of authority or have influence over others,

2    including minors and their families.

3            The defendant shall be required to provide a detailed

4    itinerary of vacations and leisure activities, including all

5    persons with whom he interacted or-- with whom he interacted or

6    had contact.

7            The special assessment in each case of $100 is

8    assessed, for a total of $200, which shall be due immediately.

9            I also want to add a prohibition on cell phones.  The

10   defendant shall not be in possession of a cell phone, without

11   the permission of his probation officer.  If he does have a

12   cell phone, with permission of his probation officer, it shall

13   be in his name and he shall give the probation officer access

14   to the account and the history on the account.

15           The Court is not going to order a fine here.  I find

16   that he does not have the ability to pay a fine.

17           And I believe that concludes the recommendations for

18   supervised release.

19           If it's not already clear from the record, I have

20   considered all of the 3553 factors.  I think the thing-- the

21   sentences that I have imposed reflect the gravity and very

22   serious nature of these offenses, promote respect for the law,

23   provide adequate deterrence both to Mr. Studabaker and to

24   others, and for the reasons I've stated, protect people from

25   further crimes of the defendant, based on the Court's very

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    strong concern that at this point Mr. Studabaker has a

2    significant threat of recidivating.

3           Mr. Denenfeld, any recommendations to the Bureau of

4    Prisons that you wish me to add which I have not covered?

5           MR. DENENFELD:  No, your Honor.

6           Your Honor, I want to make sure that the calculation

7    is correct.  I thought we started with an offense level of 27.

8           THE COURT:  Right.

9           MR. DENENFELD:  You upwardly departed five levels to

10   32, and if that's correct, my chart indicates the range of 121

11   to 151, not 135 to 168.

12          THE COURT:  Is that right, Mr. Mekaru   Did I misread

13   it?

14          MR. MEKARU:  I think Mr. Denenfeld is correct, your

15   Honor.

16          THE COURT:  Okay.  All right.  Well, then I

17   misspoke.  I intended to go to the middle of the range, so what

18   is the new one, 121?

19          MR. DENENFELD:  121 to 151.

20          THE COURT:  151, so half of that would be-- the

21   difference is 30, so it would be 136, I apologize.  136 on

22   Count One, not 144.

23          Thank you for the correction.

24          MR. DENENFELD:  Thank you.

25          THE COURT:  Thank you, Mr. Denenfeld.  I don't know


                KATHLEEN S. THOMAS, U.S. District Court Reporter
           410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1    how that happened, but I thank you for your correction.

2              Any legal objections to the sentence imposed, sir,

3    that have not already been placed on the record?

4              MR. DENENFELD:  Your Honor, I admit I try to keep up

5    with the Sixth Circuit law, and I'm not sure I am, but I know

6    that this Vowell case Mr. Mekaru cited requires me to object,

7    and so at this time, I guess, I would object to the upward

8    variance and departure as being procedurally and substantially

9    unreasonable.  I say that only because I think that covers the

10   basis for appeal.

11             Thank you.

12             THE COURT:  Mr. Mekaru, any objection?

13             MR. MEKARU:  Just I'm not quite certain about the

14   term of supervised release, and I just wanted to make certain

15   that the Court-- I know the recommendation and the statutory

16   provision on the back indicates the cap would be five years,

17   but, your Honor, it's my recollection under the Protect Act in

18   April, 2003, that it changed 3583 to allow a term of supervised

19   release to any term of years up to life.  The Adam Walsh Act

20   required there be a mandatory minimum of five years up to

21   life.  So I wasn't certain if the Court found bound and capped

22   by the five years by statute or if the Court was of a mind to

23   impose something greater, and that would be again, your Honor--

24    I forgot to bring the 2003 edition, but it is my recollection

25   that was the change of 3583 to allow up to life, and that's

1    what I've been-- that was in the plea agreement originally and

2    that was operating under that assumption.

3         THE COURT:  All right.  Well, I appreciate that,

4    Mr. Mekaru, but I'm going to order five years.

5         MR. MEKARU:  Yes, sir.

6         THE COURT:  Okay.

7         MR. MEKARU:  And regarding your question, no

8    objection.

9         THE COURT:  All right.  Any counts to be dismissed?

10        MR. MEKARU:  Yes, your Honor.  With respect to the

11   charge in Michigan, we move for dismissal of Counts Two, Three

12   and Four.

13        THE COURT:  So ordered.

14        MR. MEKARU:  With respect to the charges in North

15   Carolina, move for dismissal of Counts One and Three, and that

16   we are foregoing any sort of forfeiture action.

17        THE COURT:  All right.  That motion is granted as

18   well.

19        All right.  Anything further before I give

20   Mr. Studabaker his appellate rights?

21        MR. DENENFELD:  Not on behalf of the defense.  Thank

22   you, your Honor.

23        MR. MEKARU:  No, your Honor.  Thank you.

24        THE COURT:  All right.  Mr. Studabaker, I advise you,

25   sir, you can appeal your conviction, if you believe that your

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1    guilty plea was somehow unlawful or involuntary or if there is

2    some other fundamental defect in proceeding not waived by your

3    guilty plea.  You also have a statutory right to appeal your

4    sentence under certain circumstances, particularly if you think

5    the sentence is contrary to law.

6         However, a defendant may waive those rights as part

7    of a plea agreement, and you have entered into a plea agreement

8    which waives some of your rights to appeal, although I think

9    that was for a sentence within the guideline range, if I'm not

10   mistaken, so to the extent that I've upwardly departed, you

11   have preserved your right to appeal that.  Such waivers are

12   generally enforceable, but if you believe the waiver is

13   unenforceable, you can present that argument to the appellate

14   court.

15        You have the right to apply for leave to appeal in

16   forma pauperis, that is, if you are poor.  If you wish to do

17   so, with few exceptions, you need to file the documents for

18   which your attorney has acknowledged receipt on your behalf,

19   within ten days of the entry of the judgment in this case.  If

20   you file the documents, the Clerk of the Court will prepare and

21   file a Notice of Appeal to the Sixth Circuit Court of Appeals

22   on your behalf.

23        Is there anything further before I remand the

24   defendant, Mr. Mekaru?

25        MR. MEKARU:  No, your Honor.  Thank you.


                KATHLEEN S. THOMAS, U.S. District Court Reporter
            410 West Michigan Avenue, Kalamazoo, Michigan  49007
                            (269)385-3050

1            THE COURT:  Mr. Denenfeld?

2            MR. DENENFELD:  Not on behalf of the defendant.

3    Thank you, your Honor.

4            THE COURT:  Defendant is remanded to the marshal for

5    execution of sentence.

6            COURT CLERK:  All rise, please.

7            Court is adjourned.

8            (at 4:46 p.m., proceedings were adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                KATHLEEN S. THOMAS, U.S. District Court Reporter
              410 West Michigan Avenue, Kalamazoo, Michigan  49007
                          (269)385-3050

1

2

3

4                          REPORTER'S CERTIFICATE

5

6        I, Kathleen S. Thomas, Official Court Reporter for
     the United States District Court for the Western District
     of Michigan, appointed pursuant to the provisions of Title
7    28, United States Code, Section 753, do hereby certify
     that the foregoing is a true and correct transcript of
8    proceedings had in the within-entitled and numbered cause
     on the date hereinbefore set forth; and I do further
9    certify that the foregoing transcript has been prepared by
     me or under my direction.

10

11        I certify that the foregoing is a rue and correct
     copy of the transcript originally filed with the clerk of
     court on 9/23/08, and incorporating redactions of personal
12   identifiers requested by the following attorneys of
     record:  Daniel Y. Mekaru in accordance with Judicial
13   Conference policy.   Redacted characters appear as
     initials replacing the minor's name in the transcript.

14

15

16                       /s/

     _____
17                       Kathleen S. Thomas, CSR-1300, RPR
                         U.S. District Court Reporter
18                       410 West Michigan
                         Kalamazoo, Michigan   49007

19

20

21

22

23

24

25


           KATHLEEN S. THOMAS, U.S. District Court Reporter
        410 West Michigan Avenue, Kalamazoo, Michigan   49007
                          (269)385-3050